CORRECTED

# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 20-89V

Filed: April 16, 2025
Reissued for Public Availability: June 5, 2025

* * * * * * * * * * * * * * * * * * * * * * * * * *  *
JACLYN RUSSO, *on behalf of her minor child, C.M.*,

              Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

              Respondent.
* * * * * * * * * * * * * * * * * * * * * * * * * *  *

*Jacyln Russo*, Foresthill, CA, *pro se*.
*Mary Eileen Holmes*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION DISMISSING PETITION[1]

**Shah**, Special Master:

On January 27, 2020, Jaclyn Russo ("Petitioner" or "Ms. Russo"), on behalf of her minor child, C.M., filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). The petition was filed *pro se*. The petition alleges that C.M. suffered Tourette's syndrome[3] and unspecified "injuries"

---

[1] Pursuant to Vaccine Rule 18(b), this decision was initially filed on April 16, 2025, and the parties were afforded 14 days to propose redactions. The parties did not propose and redactions. Accordingly, this decision is reissued in its original form for posting on the court's website.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Gilles de la Tourette syndrome: a syndrome comprising both multiple motor and one or more vocal tics, occurring over a period of at least one year, at least intermittently but sometimes as frequently as many times daily. Obsessions, compulsions, hyperactivity, distractibility, and impulsivity are often associated. Onset is in childhood and tics often lessen in severity and frequency and may even remit during adolescence and adulthood. Called also Guinon disease, maladie des tics, and Tourette's. DORLAND'S MEDICAL

caused by an influenza ("flu") vaccination she received on January 24, 2017. Pet. at 1 (ECF No. 1).

Pending before me is Respondent's Motion to Dismiss the Petition as Untimely ("Motion"). ECF No. 64. For the reasons discussed below, I conclude that the Motion should be granted and the petition dismissed.

## I.  PROCEDURAL BACKGROUND

This case was filed by Ms. Russo on a *pro se* basis and assigned to former Special Master Katherine E. Oler. ECF Nos. 1, 7. Along with the petition, Petitioner filed C.M.'s birth certificate and medical records. ECF Nos. 1-1, 1-2. On February 11, 2020, Special Master Oler held an initial status conference, after which she issued an order directing Petitioner to file an update on her efforts to secure legal representation within 30 days. ECF No. 10. On April 28, 2020, Special Master Oler's law clerk communicated with Petitioner, noting that she had failed to file the required status report. *See* Informal Communication Entry dated 5/5/2020. Petitioner advised that an attorney was reviewing her case. *Id*. On June 11 and August 24, 2020, the clerk sent follow-up communications concerning Petitioner's search for counsel but received no response. *See* Informal Communication Entries dated 6/11/2020 and 8/24/2020.

On September 1, 2020, Special Master Oler issued an order directing Petitioner to refile a motion to proceed *in forma pauperis*, file outstanding medical records, and provide an update on her attempts to find counsel by October 1, 2020. ECF No. 14. She attached to the order a list of vaccine attorneys from the Office of Special Masters' website. ECF No. 14-1. On November 3, 2020, Special Master Oler issued another order noting that Petitioner had failed to comply with the September 1 order. ECF No. 15. A December 3, 2020 deadline was set to comply. *Id.* On December 9, 2020, another status conference was held at which Special Master Oler again directed Petitioner to file the required documents by January 8, 2021. ECF No. 16.

On January 13, 2021, Special Master Oler's law clerk reached out to Petitioner to inquire about her filings, which were again overdue. *See* Informal Communication Entry dated 1/13/2021. Petitioner requested a 60-day extension while she continued her search for counsel. This was granted. *See* Informal Communication Entry dated 1/19/2021. But Petitioner again did not comply. On August 2, 2021, Special Master Oler issued another order directing Petitioner to make the requisite filings by August 30, 2021. ECF No. 17.

On August 30, 2021, Petitioner filed her motion to proceed *in forma pauperis*, but she made no other filings. ECF No. 19. Her motion was granted. *See* Non-PDF Order dated 9/9/2021.

Special Master Oler issued further orders directing Petitioner to file the required materials on November 1, 2021, and January 5, March 23, and June 9, 2022. ECF Nos. 20-22, 24. After nothing was filed, Special Master Oler held a status conference on August 31, 2022, at which she directed Petitioner to file the paperwork necessary to secure a subpoena for C.M.'s outstanding

---

DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=110656 (last visited April 14, 2025) ("DORLAND'S").

medical records, with assistance from Respondent's counsel. ECF No. 26. That paperwork was not filed, and four communications by Special Master Oler's law clerk to Petitioner in October 2022 were unanswered. *See* Informal Communication Entry dated 11/2/2022. On November 2, 2022, Special Master Oler set a December 2, 2022 deadline to file the necessary paperwork; failure to comply would result in the issuance of an order to show cause why the case should not be dismissed for failure to prosecute. ECF No. 27. On December 2, 2022, Petitioner filed the motion for a subpoena, which was granted. ECF Nos. 28, 30. Petitioner sent the subpoena to C.M.'s provider. On January 26, 2023, Special Master Oler directed Petitioner to file a status report on her progress in securing the medical records by February 27, 2023. ECF No. 33. This deadline was subsequently extended to March 8, 2023. ECF No. 36.

On February 14, 2023, more than three years after the filing of the petition, Petitioner filed medical records from Kaiser Permanente health system. ECF No. 39. On May 1, 2023, Petitioner filed C.M.'s individualized education plan and a progress report from her school. ECF Nos. 40-41.

On August 21, 2023, Respondent filed his Rule 4(c) Report ("Report"). ECF No. 46. Respondent argued that the petition was barred by the applicable statute of limitations. Report at 39. The petition alleged the onset of C.M.'s symptoms occurred "within four to five hours of her flu vaccination" on January 24, 2017. *Id.* at 40. Consistently, medical records from January 27, 2017, indicated that C.M.'s symptoms had begun three days earlier, on the same day as vaccination. *Id.* Under the Vaccine Act, the petition was required to be filed within 36 months of the onset of symptoms, or by January 24, 2020. *Id.* at 39-40. The Vaccine Rules, which carry the force of law and are binding on the parties, state that a paper petition is "filed" when it is received by the Clerk's Office at the Court of Federal Claims ("CFC"). *Id.* at 40. Here, the petition was received and filed on January 27, 2020, making it untimely and subject to dismissal. *Id.* at 41.

Respondent further argued that this case is not appropriate for equitable tolling, which applies only in "extraordinary circumstances," including instances of fraud, duress, or where the claim is procedurally defective. Report at 42. This case does not present such circumstances. *Id.* at 43. Also, Petitioner had failed to meet her burden of proof. *Id.* She failed to provide any evidence showing that the flu vaccine can cause Tourette's syndrome, a logical sequence of cause and effect between C.M.'s vaccination and her condition, or a medically appropriate temporal relationship between the vaccination and the onset of C.M.'s condition. *Id.* at 43-47.

On September 11, 2023, Special Master Oler held a status conference at which she noted that the Report had identified a number of medical records that had not yet been filed. ECF No. 48. Petitioner was given 60 days to file the outstanding records. *Id.* Petitioner requested and received a 30-day extension to file the records on December 4, 2023. ECF No. 49. On January 9, 2024, Special Master Oler granted a second extension until February 23, 2024. ECF No. 51. A third extension was granted April 2, 2024; a fourth was granted June 14, 2024. ECF Nos. 53, 56.

On August 14, 2024, this case was reassigned to me. ECF No. 57. Petitioner still had not filed the outstanding records. On August 27, 2024, I set a September 26, 2024 deadline to file the records, advising that if the deadline were not met, I would schedule a status conference to inquire about the delay. ECF No. 58. Petitioner failed to meet that deadline, so on October 2, 2024, I held

a status conference with both parties. ECF No. 60. At the conference, Petitioner advised that she had requested additional medical records from C.M.'s providers but had not received them. *Id.* at 1. She had not attempted to secure counsel, noting that her earlier efforts to do so were unsuccessful because of the concern that the petition was untimely. *Id.* I explained to Petitioner that it was her responsibility to obtain all outstanding medical records or, alternatively, a statement from C.M.'s providers confirming such records do not exist. *Id.* I set a December 6, 2024 deadline for her to do this. *Id.* at 2.

On December 5, 2024, Petitioner filed billing records from Kaiser Permanente, which primarily covered services provided in January and February 2017. ECF No. 62-1. On December 6, 2024, after receiving a status report from Petitioner requesting more time, I extended the deadline to December 20, 2024. ECF No. 63. On December 23, 2024, Petitioner filed a portable storage disc containing additional materials.

On January 8, 2025, Respondent filed the present Motion, arguing that the case should be dismissed for the reasons previously set forth in the Report. ECF No. 64. I issued an order directing both parties to brief the issue in light of all of the filed materials. ECF No. 65. On February 6, 2025, Respondent filed a memorandum in support of the Motion. ECF No. 66. Petitioner filed a responsive brief on March 12, 2025. ECF No. 67 ("Response"). Petitioner argues that the petition was timely because the limitations period was not triggered until January 27, 2017, the day she first sought treatment for C.M.'s post-vaccination injury. *Id.* at 2. In the alternative, she argues that equitable tolling should be applied because the vaccine provider allegedly fraudulently concealed the fact that the wrong vaccine dose was given to C.M., and because of the emotional hardship she has suffered related to C.M.'s injury. *Id*. at 1, 4. Finally, Petitioner argues that she should be allowed to amend her petition to add further information about C.M.'s condition. *Id.* at 2. Respondent did not file a reply brief.

## II.   FACTUAL BACKGROUND

Because the issue raised by the present Motion is whether the petition was timely filed, I describe here only the facts relevant to that question.

C.M. received the subject flu vaccination on January 24, 2017, at the office of her pediatrician, Amy Westman, M.D. ECF No. 39 at 53, 58.[4] She was six years old at the time. *Id.* at 52. C.M.'s chief complaint that day was abdominal pain. *Id.* But at that visit, Petitioner reported that C.M. had tics, for which she was planning to be seen by a mental health professional and which were "getting worse." *Id*. Petitioner was "[c]oncerned about [Tourette's]." *Id.*

The record indicates that C.M. had a normal exam. ECF No. 39 at 53. Dr. Westman assessed abdominal pain and a "tic disorder" and agreed with the plan for C.M. to see a mental health provider. *Id.* She ordered labs and the administration of a seasonal flu vaccine, "3 YRS-ADULT, IM," at that visit. *Id.* The vaccination record, however, shows that C.M. was given a "9 yrs-adult (AFLURIA)" flu vaccine. *Id.* at 58.

---

[4] Petitioner did not file marked exhibits. Accordingly, this Decision cites to the CM/ECF docket numbers and page designations.

4

Three days later, on January 27, 2017, at 8:38 a.m., Dr. Westman called Petitioner to report that her blood tests were negative. ECF No. 39 at 73. Her notes stated that C.M. had been seen in the emergency department ("ED") on January 24, 2017, and had been prescribed Keflex[5] for a urinary tract infection ("UTI").[6] *Id.* However, C.M.'s urine culture was negative, so Dr. Westman recommended that she stop taking the antibiotic. *Id.*

Later that day, at 12:41 p.m., Petitioner called the nurses' line at Dr. Westman's office. ECF No. 39 at 74. Petitioner reported C.M. was suffering "body jerks" and was "unstable when walking, thought process slower." *Id.* She stated that C.M. "fell on escalator 1/20/17," and the record stated the onset of C.M.'s symptoms was January 20, 2017. *Id.* C.M.'s "pertinent history" included tics. *Id.* Nurse Christine Johnson booked a telephone consultation for Petitioner with Dr. Westman. *Id.*

Petitioner spoke with Dr. Westman at 4:55 p.m. on January 27, 2017. ECF No. 39 at 78. The record stated:

> Spoke with [C.M.'s] mother.
>
> Stomach pain getting better. Working on constipation.
>
> Tics getting worse – previously small facial or motor movements or vocal. Now having full body jolts. Left knee goes in and inverts ankle when she walks. Fallen 2 times just standing due to limb movements. Noticed joints held in a funny way this past week, wrists are bent, flexing when she throws her arms out. ***Noticed it starting 3 days ago after her office visit with me.*** Mother afraid to leave her alone in a room, very scared and "knows something is wrong with her daughter."
>
> Fell down escalator one week ago. Head and neck pain, back pain mild at times since. EMT checked her out at the scene and said she was fine. Not sure if she hit her head. Mother thinks she fell due to movements perhaps, but she did not witness it.
>
> Movements sound like could have progressed into chorea. Consider less likely partial seizures, [consider] progression of [Tourette's].

---

[5] Keflex: trademark for preparations of cephalexin. DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=26786 (last visited April 9, 2025); Cephalexin: a semisynthetic first-generation cephalosporin, effective against a wide range of gram-positive and a limited range of gram-negative bacteria; administered orally in the treatment of tonsillitis, otitis media, and infections of the genitourinary tract, of bones and joints, and of skin and soft tissues. DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=8629 (last visited April 9, 2025).

[6] The docket does not include any record of a January 24, 2017 ED visit, despite the extensive opportunities Petitioner was given to obtain complete records.

5

> Sudden onset and worsening is concerning and I would like her to have a fast work up.
>
> Recommend work up – labs plus brain MRI/CT, consider EEG.
> Has Pedi Neuro consult via telephone schedule[d] for next week for tics.
>
> Recommend ED visit tonight so she can have a[] full neurologic exam and any brain imaging or labs needed to rule out emergent issues. Will follow-up with mother tomorrow and continue any work up needed.

*Id.* at 78-79 (emphasis added).

About 90 minutes later, Petitioner spoke to pediatric neurologist Jean Hayward, M.D., by phone. ECF No. 39 at 76. Petitioner reported that C.M. had had vocal "tics for years" but now had motor tics that occurred daily. *Id.* She had fallen down an escalator and experienced "balance problem[s]" and full body jerks. *Id.* She fell twice the previous day (January 26, 2017). *Id.* She also had an abnormal gait, including bending the left knee inward and "kick[ing] the ankles in" every couple steps. *Id.* She also had a "hard time falling asleep." *Id.* She had experienced a fever several weeks earlier and had vomited four times in the past month and a half. *Id.* She had slower cognition. *Id.* Dr. Hayward recommended that C.M. go to the ED and possibly get a CT scan. *Id.* An appointment was made to see C.M. the following week in person. *Id.*

The next day, January 28, 2017, Dr. Westman had a follow-up call with Petitioner. ECF No. 39 at 85. She reported that she had taken C.M. to the ED the previous night.[7] *Id.* Her head CT was negative, as was her lab workup. *Id.* A number of lab tests were still pending. *Id.* Petitioner reported that once C.M. fell asleep her "movements pretty much went away." *Id.* She resumed "some movements" after she woke up, and she still was "flexing wrists to extreme." *Id.* C.M. said she felt better when she did the movements. *Id.*

On January 29, 2017, Petitioner called Dr. Westman's nurses' line again, reporting that C.M. had "[i]ntermittent tummy aches, random jerking and frequent involuntary spasms," and that her "eyes [were] sensitive to light" and were "fluttering" that day. ECF No. 39 at 86. She was also nauseated. *Id.* Petitioner reported the onset of C.M.'s symptoms was "2-4 [weeks]" earlier. *Id.*

On January 31, 2017, Petitioner brought C.M. to see Dr. Hayward. ECF No. 39 at 91. C.M. was reportedly having difficulty sleeping and would move her legs intermittently. *Id.* Petitioner did not report a specific onset date of C.M.'s symptoms. A neurological examination was normal except for an "intermittent swallowing sound." *Id.* at 92. Dr. Hayward prescribed clonidine and diagnosed C.M. with "tics, sleep problems, possible RLS [restless leg syndrome] vs. OCD [obsessive compulsive disorder] vs. other." *Id.*

---

[7] The filed records show that emergency physician Grace Ahn, M.D., messaged Petitioner through C.M.'s patient portal on February 1, 2017, to inquire how C.M. was doing following this ED visit. ECF No. 39 at 95. Again, no records of the ED visit itself have been filed.

On February 2, 2017, Petitioner had a call with Dr. Westman, during which she reported being "very worried" about the quick onset of new tics and movements in C.M., but no specific onset date was documented. *Id.* at 104.

On March 21, 2017, C.M. saw pediatric neurologist Amit Malhotra, M.D. ECF No. 39 at 208. The history noted that Petitioner reported C.M. had experienced vocal tics for more than two years and motor tics over the past six months. *Id.* Dr. Malhotra diagnosed Tourette's syndrome. *Id.* at 209-10.

### III.  APPLICABLE LAW

#### A.  Vaccine Act Statute of Limitations

The Vaccine Act provides:

> [I]f a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury.

§ 300aa-16(a)(2). The three-year limitations period begins to run from the date of the first symptom or "manifestation of onset," whether or not that symptom or manifestation of onset would be sufficient for a diagnosis, and whether or not the petitioner understood its significance at the time. *Carson v. Sec'y of Health & Hum. Servs.,* 727 F.3d 1365, 1369 (Fed. Cir. 2013). The "first symptom or manifestation of onset,' . . . is the first event objectively recognizable as a sign of a vaccine injury by the medical profession at large." *Markovich v. Sec'y of Health & Hum. Servs.*, 477 F.3d 1353, 1360 (Fed. Cir. 2007).

The statute of limitations is not affected by whether a petitioner understands the cause of her injury. *See Cloer v. Sec'y of Health & Hum. Servs.,* 654 F.3d 1322, 1340 (Fed. Cir. 2011). Thus, the period begins to run at the time of the first objectively recognizable sign of the injury, whether or not the petitioner recognizes the injury was caused by the vaccine. *Id.*

#### B.  Filings Under The Vaccine Act

The specifics regarding Vaccine Program filings are documented in the Vaccine Rules, which are legally binding on the parties. *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183-84 (Fed. Cir. 1993) ("It is well established that a court's procedural rules promulgated pursuant to statutory authorization are deemed to have the force and effect of law" and, "once adopted by the court, [are] binding on both the court and the parties litigating before [it] . . .").

The Vaccine Rules state that a paper petition is filed "by delivering it to the clerk at the address provided in Vaccine Rule 2." Vaccine Rule 17(b)(2). The Rules further state that "A document in paper form is filed when it is received and marked filed by the clerk, not when mailed." Vaccine Rule 17(b)(4)(A).

7

### C. Equitable Tolling

In *Cloer,* the Federal Circuit recognized that the Vaccine Act's three-year limitations period could be subject to equitable tolling in very rare and extraordinary circumstances, such as cases of fraud or duress. 654 F.3d at 1340, 1344. The court clarified that "equitable tolling requires a litigant to have diligently pursued his rights, but that 'some extraordinary circumstances stood in his way.'" *Id.* at 1344 (quoting *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)).

"[E]quitable tolling is to be used 'sparingly' in federal cases and has been limited to cases involving deception or the timely filing of a procedurally defective pleading." *Cloer*, 654 F.3d at 1345 (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)). This remedy "has typically been reserved for circumstances in which fraud or deceit on the part of the opposing party caused the movant to allow the deadline to pass." *Simmons v. Sec'y of Health & Hum. Servs.*, No. 23-121V, 2023 WL 9059510, *5 (Fed. Cl. Spec. Mstr. Dec. 7, 2023) (citing *Cloer*, 654 F.3d at 1344-45).

The fact that a petitioner is proceeding *pro se* does not itself warrant tolling the statute of limitations. *Simmons*, 2023 WL 9059510, at *5 ("[T]he claim that ignorance of the law constitutes extraordinary circumstances . . . has been soundly rejected by several courts.") (citing *Clubb v. Sec'y of Health & Hum. Servs.*, 136 Fed. Cl. 255, 266 (2018) (upholding the special master's rejection of *pro se* status as a "disadvantage" sufficient to toll the statute of limitations); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012) (Federal habeas petitioner's "pro se status and lack of knowledge of the law are not sufficient to constitute an extraordinary circumstance and to excuse his late filing.") (citations omitted); *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) ("[E]ven in the case of an unrepresented prisoner, ignorance of the law is not a basis for equitable tolling.") (citations omitted)).

## IV. ANALYSIS

### A. The Petition Was Untimely

In this case, under the Vaccine Rules, Petitioner's paper petition was received and filed by the CFC Clerk's Office on January 27, 2020. *See* ECF Nos. 1, 1-3 (petition and mailing envelope from Petitioner). The medical records show that, at the latest, C.M. developed symptoms associated with the condition alleged, Tourette's syndrome, on January 24, 2017. Because the petition was filed more than 36 months after the appearance of C.M.'s symptoms, it is time-barred under the Vaccine Act.

Tourette's syndrome typically arises in childhood and is characterized by the presence of multiple motor and vocal tics that endure for at least one year. *See* DORLAND'S, *supra* note 3. The tics may be associated with obsessions, compulsions, hyperactivity, distractibility, and impulsivity. *Id*. Three days after the January 24, 2017 vaccination, Dr. Westman documented petitioner's report that C.M. had developed symptoms, including worsening tics, altered gait, and falls, "3 days ago after her office visit with me." ECF No. 39 at 78-79. C.M.'s development of worsening tics, altered gait, and/or falls would likely be viewed by a medical professional as "objectively recognizable" signs of possible injury. This, in fact, is borne out by the medical

8

records in this case. During her January 27, 2017 call with Petitioner, Dr. Westman expressed concern that C.M. had suddenly developed these new/worse symptoms three days earlier. ECF No. 39 at 78. Dr. Westman advised Petitioner to take C.M. to the ED that night for a "full neurologic exam and any brain imaging or labs needed to rule out emergent issues." *Id.* at 79.

Petitioner does not dispute either the accuracy of these statements in the records or the timing of the filing of her petition. Instead, she appears to argue that, because C.M.'s first medical *visit* after the vaccination was not until January 27, 2017, that day should be deemed the trigger for the limitations period. Response at 2 (stating that "the first medical documentation of symptoms related to this matter was recorded on January 27, 2017, as substantiated by emergency room notes and pediatrician records."). She further claims that Respondent is "attempting to mislead the court" and cause confusion by arguing January 24, 2017, is the operative date. *Id.* at 2-3. Under the plain terms of the Vaccine Act, however, the limitations period is triggered by the first symptom or manifestation of onset experienced by the injured individual, which might not coincide with the first date symptoms are documented or treatment initiated. *See* § 300aa-16(a)(2) (providing that "no petition may be filed for compensation under the Program for such injury after the expiration of 36 months *after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury*.") (emphasis added). Petitioner's argument therefore is inconsistent with the statute's language. Furthermore, reading the Vaccine Act to equate the appearance of symptoms with the date medical care was first documented would be incongruent with standard medical recordkeeping practices: if symptom "onset" were synonymous with the date a patient first sought medical care, leading to the creation of a medical record, providers would have no need to inquire about and record a *separate* date of "onset," as routinely occurs. *See, e.g.,* ECF No. 39 at 74 (record of January 27, 2017 call documenting the "onset" of C.M.'s symptoms as January 20, 2017); *Id.* at 86 (record of January 28, 2017 call documenting the "onset" of C.M.'s symptoms as two to four weeks earlier).

Petitioner argues that "[a]ccording to the Federal Circuit's legal standards, the statute of limitations under the Vaccine Act begins to run at the first indication of symptoms *recognized as vaccine-related injuries by the medical community*. In this case, the relevant date is indeed January 27, 2017." Response at 2 (emphasis added). She further points out that at the time her petition was filed, C.M. did not have a "definitive diagnosis." *Id.* The case law, however, makes clear that the Vaccine Act's limitations period begins to run from the date medically recognizable symptoms first occur, whether or not the petitioner has been diagnosed and even if she does not relate the symptoms to the vaccine. *Carson,* 727 F.3d at 1369; *Markovich*, 477 F.3d at 1358-60; *Cloer,* 654 F.3d at 1340.

In sum, I conclude that under a liberal reading of the records, C.M. developed symptoms of the injury alleged on January 24, 2017, meaning that the petition seeking recovery for that injury must have been filed no later than January 24, 2020.[8] Because the petition was not filed until

---

[8] I note that the medical records indicate possible earlier dates of the appearance of C.M.'s symptoms. For example, at the visit with Dr. Westman on the day of vaccination, Petitioner reported that C.M. already had tics that were "getting worse." ECF No. 39 at 52. She was already concerned C.M. might have Tourette's syndrome. *Id.* When Petitioner called Dr. Westman's nurse advice line the afternoon of January 27, 2017, to report C.M. was suffering from "body jerks" and was "unstable when walking, thought process slower," she said C.M. had fallen on an escalator on January 20, 2017, and the nurse documented that the "onset" of

9

January 27, 2020, by the plain terms of the Vaccine Act and its implementing rules, it was untimely and is subject to dismissal.

### B. Equitable Tolling Is Not Justified

Petitioner argues that the doctrine of equitable tolling should be applied to permit her petition to be heard. Response at 3. She states that "equitable tolling serves as a critical safeguard within the legal framework, allowing for an extension of the statute of limitations when extraordinary circumstances impede an individual's ability to file a claim despite their reasonable diligence." *Id.*

#### 1. Fraudulent Concealment

Petitioner first argues equitable tolling is warranted here because there was "fraudulent concealment" of the fact that C.M. was inadvertently given a flu vaccine that was actually intended for Petitioner's husband. Response at 3. She claims that Petitioner's healthcare provider altered the medical records to hide this error. *Id.* at 4. She also contends the vaccination was not billed to the insurance provider and that the vaccination record was filed in a "Historical Records" section of C.M.'s chart to obscure the mistake. *Id.* She states that there are "additional details pertinent to this matter," but she declines to disclose those details to "preserve the potential for seeking justice in the future." *Id.*

Petitioner's arguments do not justify tolling the statute of limitations period here, for several reasons. First, the evidence does not substantiate her claim of concealment. For one thing, the filed medical records plainly documented that C.M. was given a vaccine intended for children over 9 years of age and adults. ECF No. 39 at 53, 58 (recording that, although Dr. Westman ordered the administration of a "3 YRS-ADULT, IM" flu vaccine, C.M. was given a "9 yrs-adult (AFLURIA)" vaccine). Thus, the assertion that the clinic modified and/or misfiled the record to hide this does not appear to have merit. Similarly, the Kaiser Permanente billing records from January 24, 2017, do reflect billing for a flu vaccine and the administration thereof.[9] ECF No. 62-1 at 11.

---

C.M.'s symptoms was January 20. *Id.* at 74. When Petitioner called Dr. Westman's office on January 29, 2017, she reported that the "onset" of C.M.'s symptoms was "2-4 [weeks]" earlier, or between January 1 and January 15, 2017. *Id.* at 86. And, when C.M. saw Dr. Malhotra on March 21, 2017, Petitioner reported she had experienced vocal tics for more than two years and motor tics for the previous six months. *Id.* at 208.

As discussed below, the fact that C.M. had pre-vaccination symptoms such as tics suggests that Petitioner could have asserted a significant aggravation theory of entitlement. *See* § 300aa-11(c)(1)(C). However, a petition based on a significant aggravation theory would also be time-barred, because the limitations period for such a claim expires 36 months after the significant aggravation of the injury. § 300aa-16(a)(2). Again, the medical records show that C.M. developed concerning new symptoms associated with Tourette's syndrome on January 24, 2017, so a claim asserting significant aggravation of Tourette's syndrome would have been due no later than January 24, 2020.

[9] Also, Petitioner has chosen not to file further evidence she claims to have. Response at 4. Unfiled evidence cannot be considered in my analysis, for obvious reasons.

10

Second, even assuming truth of the claim that the medical clinic attempted to conceal the administration of the wrong vaccine to C.M., that would not justify tolling the statute of limitations applicable to Petitioner's vaccine injury claim. The Vaccine Act's limitations period, as discussed, runs from the date of the first objectively recognizable sign of the injury. The timing of this event would not normally change because the vaccination record was incorrect, fraudulent, or altered to obscure the fact that the wrong vaccine was given. In fact, the petition and medical records here clearly documented that Petitioner recognized new symptoms in C.M. the same day as the vaccination. Whether Petitioner knew at the time that C.M. had been given the wrong flu vaccine is not material, since the limitations period runs even if the petitioner is unaware of the cause of her symptoms or has no diagnosis. *See Cloer*, 654 F.3d at 1340. Overall, the facts show that Petitioner had the same knowledge and opportunity to file a vaccine injury claim as every other putative petitioner in the Program.

Third, although Petitioner is correct that "fraudulent concealment" can be a basis for invoking equitable tolling, that term has been construed to mean concealment of facts that work to deprive the injured party of knowledge of their right to file a claim, usually by the opposing party. *See Simmons*, 2023 WL 9059510, at *9 (citing *Irwin*, 498 U.S. at 96; *Cloer*, 654 F.3d at 1344). The evidence does not support such a contention here, as described above. Instead, again, it shows Petitioner was aware of C.M.'s new symptoms on the day of the vaccination. This awareness put her on legal notice of her right to file a vaccine injury petition and triggered the three-year time to do so.

2. Emotional Hardship Caused By The Injury

Petitioner also generally argues that her daughter's illness has taken a significant emotional toll on her, which made it difficult for her find counsel and prosecute a claim. Response at 1. Equitable tolling has been applied in cases involving the demonstrated mental incapacitation of the petitioner. *K.G. v. Sec'y of Health & Hum. Servs.*, 951 F.3d 1374, 1381-82 (Fed. Cir. 2020). In such cases, the degree of mental impairment has been "unquestionably debilitating." *Simmons*, 2023 WL 9059510, at *6. *Compare, e.g., K. G.* 951 F.3d at 1377 (applying equitable tolling where the petitioner suffered from alcoholism, anxiety, depression, severe memory loss, and a strained relationship with her then-acting legal guardian and conservator); *Gray v. Sec'y of Health & Hum. Servs.*, No. 15-146V, 2016 WL 6818884, at *5 (Fed. Cl. Spec. Mstr. Oct. 17, 2016) (finding that petitioner was mentally incapacitated where evidence showed that she "lacked the mental capacity to make decisions on her own" and she was "completely reliant on her daughter."); *with W.J. by R.J. v. Sec'y of Health & Hum. Servs.*, No. 2022-2119, 93 Fed.4th 1228 (Fed. Circ. 2024) (finding a child's mental incapacity and inability to communicate did not warrant equitable tolling); *Simmons*, 2023 WL 9059510, at *7 (finding petitioner's symptoms did not prevent her "from thinking rationally, making deliberate decisions, handling her own affairs, or participating in society."). While I have no doubt C.M.'s condition has brought hardship to Ms. Russo and her family and has been emotionally taxing, there is no evidence this resulted in debilitating mental incapacitation justifying the tolling of the three-year limitations period afforded to all Vaccine Program petitioners.

11

Overall, I conclude that Petitioner has not shown the existence of extraordinary circumstances that deprived her of her right to file a vaccine injury petition on C.M.'s behalf. Thus, I decline to apply the doctrine of equitable tolling to revive her case.

### C. <u>Amendment Of The Petition Would Be Futile</u>

Petitioner argues that she should have an opportunity to amend the petition. Response at 2. She does not seek to change the injury alleged or offer a different timeline of the relevant events. Instead, she appears to want to introduce more information about C.M.'s condition:

> At the time of filing, a definitive diagnosis had not yet been established. My child, C.M., was enduring significant distress, being shuffled through various medical departments without any clear explanation for her condition. Notably, these perplexing symptoms emerged shortly after she received the influenza vaccine. Despite our repeated assertions that these symptoms were linked to the vaccine, we were consistently informed that there was no connection—a narrative that will soon be scrutinized. It is essential to clarify that my initial petition was solely aimed at meeting the 36-month deadline, rather than serving as a comprehensive argument supported by medical acknowledgment, which was absent at that time. It was not feasible to file a petition that could not be amended, especially given that we did not receive a diagnosis until four years post-injury. In response to the Respondent's assertion that my daughter suffered from Tourette's syndrome following her vaccination on January 24, 2017, I must emphasize that this claim, derived from the petition which lacks substantive merit and motion to dismiss be denied and I be given the chance to properly amend my petition and that the court except and acknowledge the date of the filling attended by myself the petitioner so that the records match the amended petition set forth and intend to file when we proceed from this matter at hand.

*Id.* This argument lacks merit. First, as a factual matter, the medical records indicate that C.M. first was diagnosed with the injury alleged, Tourette's syndrome, in March of 2017, not four years after the vaccination, as Petitioner states. ECF No. 39 at 209-10. Second, even if Petitioner were to add further information about C.M.'s later medical course, the deficiency with the original petition is not how comprehensive or definitive the petition was at the time of filing, but the fact that it was filed more than 36 months after the appearance of Tourette's syndrome symptoms in C.M. Amendment of the petition to add further facts relating to C.M.'s later course would not change this conclusion.

Finally, the records show that before the vaccination, C.M. already had symptoms Petitioner suspected were signs of Tourette's syndrome. Petitioner does not explicitly seek to amend the petition to allege the vaccination significantly aggravated preexisting Tourette's syndrome in C.M. However, I note that even if she did, the statute of limitations analysis would not change, and the amended petition would still be untimely. The statute of limitations for claims based on significant aggravation is "36 months after the date of the occurrence of the first symptom or manifestation of onset *or of the significant aggravation of such injury*." § 300aa-16(a)(2) (emphasis added). As discussed above, the records demonstrate that C.M. developed new or

12

worsened symptoms associated with Tourette's syndrome on the day of vaccination, January 24, 2017, meaning that the petition must have been filed no later than January 24, 2020.

As such, I conclude that an amended petition would suffer the same deficiency as the original and would be subject to dismissal as untimely. Thus, amendment of the petition would be futile and will not be permitted.

## V. CONCLUSION

I am certainly sympathetic to Ms. Russo's situation and the ordeal she, C.M., and their family have experienced. I am, however, bound to follow the law and facts in each case before me. Petitioner was given a full and fair opportunity to file a claim, secure counsel, and prosecute her case. Unfortunately, the facts show that she failed to timely file the petition, warranting dismissal pursuant to the Vaccine Act's statute of limitations. No extraordinary circumstances exist justifying equitable tolling in this case. Accordingly, I hereby **GRANT** Respondent's Motion. The petition is hereby **DISMISSED**.

A copy of this Decision shall be sent to Petitioner by email to jaclynonstott@icloud.com.

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master